# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOEL SALZ, | ) | No. CV 06-1821-GW(Ex) |
| | ) | |
| Plaintiff, | ) | **STATEMENT OF DECISION** |
| | ) | |
| v. | ) | |
| | ) | |
| STANDARD INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_**Salz v. Standard Insurance Company, et al.**_, Case No. CV-06-1821
Statement of Decision

## I. Background

This is an action for benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff Joel Salz ("Plaintiff") sued defendants Standard Insurance Company ("Standard") and MTC Manufacturing Long Term Disability Plan arising out of the denial of his claim for long-term disability benefits following an injury he incurred while assisting in the relocation of his employer's offices. Standard issued Plaintiff's employer – MTC International, LLC ("MTC") – a Group Long-Term Disability Insurance Policy ("the Policy") which covered Plaintiff. _See_ Administrative Record ("AR") at "bates-stamped" pages 00001-27,[1] Docket No. 26.

This Court issued an initial decision in this matter on January 15, 2009. _See_ Docket No. 45. On June 1, 2010, the Ninth Circuit Court of Appeals reversed that decision and remanded the case to this Court in a Memorandum disposition ("Ruling"). _See_ Docket No. 57. In that Ruling, the Ninth Circuit held that this Court should "apply the structural conflicts framework as elucidated in" _Montour v. Hartford Life & Accident Insurance Co._, 588 F.3d 623 (9th Cir. 2009) – which had not been issued as of this Court's January 15, 2009 decision – instead of relying upon "'a line of cases' such as _Jordan v. Northrup Grumman Corp. Welfare Benefit Plan_, 370 F.3d 869 (9th Cir. 2004)." Ruling at 2.

The Ninth Circuit also "note[d] a number of nonexhaustive facts and circumstances" this Court "should consider on remand." _Id._ It mentioned three such "facts and circumstances" in particular: 1) that Standard had "mentioned the fact of [Plaintiff's social security benefits] award without analyzing the distinctions between the basis [sic] for the two awards," _id._ at 2-3; 2) that Standard was required to have "analyze[d], in a reasoned and deliberative fashion, what the claimant actually does

---

[1] It is noted that most of the items in the AR have been placed in reversed order, such that one must go backwards to read the full document. Thus, for example, the Policy begins on page 00027 and ends on page 00001 of the AR.

before it determines what the 'Material Duties' of a claimant's occupation are," *id.* at 3; and 3) even assuming Standard's exclusive reliance on the Department of Labor's Dictionary of Occupational Titles (1991) ("DOT") was proper, the way in which it did so had been "unreasonable" because it: a) used the DOT's "sedentary" classification despite accepting that Plaintiff "could not sit for a prolonged period of time in a fixed position, such as sitting at a computer," and b) took the position that Plaintiff's managerial occupation "would typically allow for maximum self regulated flexibility in position change" despite nothing in either the DOT or the administrative record supporting that "conclusory statement," *id.* at 3-4. The Ninth Circuit did not otherwise comment on this Court's previous analysis and factual findings.

Because this matter was tried to the Court, pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court must issue a memorandum of decision.

## II. Underlying Facts

### A. The Group Policy

The Policy provides Plaintiff with a gross monthly long term disability ("LTD") benefit of up to $3,500, to age 65, reduced by Deductible Income (*e.g.* Social Security Disability and Workers' Compensation benefits), should he become disabled from performing the "Material Duties" of his "Own Occupation." [AR 00023]. As relevant here, the Policy defines "disability" as:

> During the Benefit Waiting Period and the Own Occupation Period, you are required to be disabled only from your Own Occupation. You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder: (1) You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and (2) You suffer a loss of at least 20% of your Indexed Pre-Disability Earnings when working in your Own Occupation.

[AR 00018]. The Policy defines "Own Occupation" as:

> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your

2

job for your Employer, but we may also look at the way the
occupation is generally performed in the national economy.

[AR 00017].  The Policy defines "Material Duties" as:

Material Duties means the essential tasks, functions and
operations, and the skills, abilities, knowledge, training and
experience, generally required by employers from those
engaged in a particular occupation that cannot be
reasonably modified or omitted.

[*Id.*].  Policy expressly and unambiguously confers discretion upon Standard, as follows:

Except for those functions which the Group Policy
specifically reserves to the Policyowner or Employer, we
have full and exclusive authority to control and manage the
Group Policy, to administer claims, and to interpret the
Group Policy and resolve all questions arising in the
administration, interpretation and application of the group
policy.
Our authority includes, but is not limited to;

. . .
(3) the right to determine;
    a. Eligibility for insurance;
    b. Entitlement to benefits;
    c. The amount of benefits payable; and
    d. The sufficiency and the amount of
    information we may reasonably require to
    determine a., b., or c., above.
Subject to the review procedures of the Group Policy, any
decision we make in the exercise of our authority is
conclusive and binding.

[AR 00006].

B.  Plaintiff's Injury and Pre-Claim Medical Treatment

Plaintiff was born on February 26, 1947.  [AR 00425].  He began employment
with MTC on August 14, 1992.  [AR 00429].

On January 24, 2004, Plaintiff performed heavy lifting and frequent bending
while assisting in the move of his division to a new location.  [AR 00244].  He endured
some mild discomfort in his lower back at that time, but it did not prevent him from
performing the usual and customary duties of his job immediately thereafter.  [*Id.*].  On
February 9, 2004, while bending over at work to pick up a carpet remnant, he
experienced a severe pain in his lower back.  [*Id.*].  He contacted his primary care

3

physician, Dr. Jay Gordon, who prescribed Flexeril, Ambien, and Vicodin. [AR 00243]. Plaintiff returned to work the following day using the medications. [*Id.*].

Approximately a week later, Plaintiff began experiencing pain in his lower back that radiated to his left leg. [*Id.*]. He went to a local chiropractor, Dr. Jeff Ptak, on February 16, 17, and 18, but the treatment provided insufficient relief. [*Id.*].

On February 23, 2004, Plaintiff saw Dr. Gordon's associate, Dr. Morrison, who prescribed physical therapy twice a week for twelve weeks. [*Id.*]. During the fourth week of physical therapy, he indicated that his neck, upper back, and arm started bothering him. [AR 00499].

On March 19, 2004, Plaintiff saw Dr. Jae Chon who specializes in spine surgery at Kerlan-Jobe Orthopaedic Clinic. [AR 00195 - 93, AR 00499]. Plaintiff told Dr. Chon that the initial pain was "8 to10 out of 10" but since receiving physical therapy treatment it had decreased to 1 out of 10. [AR 00195]. He denied any further radiation, numbness or tingling. [*Id.*]. Dr. Chon conducted a physical examination and Plaintiff demonstrated no tenderness to palpation on his back, but experienced a slight increase of pain with range of motion. [AR 00194]. Dr. Chon took x-rays of his lumbar spine, which displayed a moderate loss of disc height. [*Id.*]. Dr. Chon concluded that Plaintiff had "degenerative disc disease and left sciatica, which is responding quite well to therapy." [*Id.*]. Dr. Chon listed his work status as "continue working/unrestricted." [AR 00193].

On April 16, at his second appointment with Dr. Chon, Plaintiff indicated that, although the therapy was helping his lower back and provided a "significant improvement in terms of his discomfort and pain," while performing some of the exercises and the stretching program, he started experiencing some discomfort in the neck and upper back area with tingling traveling down his right arm. [AR 00198]. Dr. Chon indicated that Plaintiff's neck displayed no tenderness to palpation and he had full range of motion without a significant increase in pain. [*Id.*]. He took x-rays of Plaintiff's cervical spine area, which showed a narrowing of the C5-6 and C6-7 disc spaces and anterior bone spurs that displayed a greater detriment on his left side. Dr. Chon gave the following assessment:

> As far as the lower back problem of degenerative disc disease and left sciatica, the patient is responding to therapy quite well. He is now developing some neck

> and upper back pain and some radiating pain to both
> arms due to arthritis as well as a pinched nerve in the
> neck or cervical radiculopathy.

[*Id.*]. Dr. Chon recommended physical therapy on Plaintiff's upper back and neck, and requested an ergonomic evaluation of his work station. [AR 00197]. He continued him on "full duty" work status. [AR 00197 - 96].

Plaintiff saw Dr. Chon on May 14 and indicated that he was experiencing low back and neck pain which was not responding to therapy. [AR 00200]. He demonstrated tenderness in the neck, the trapezius area, and the lower back, as well as an increase in pain with range of motion. Dr. Chon changed Plaintiff's work status to "temporarily totally disabled" for the next four weeks. [AR 00199].

On June 2, 2004, an MRI was performed on Plaintiff's lumbar and cervical spine areas at the Westchester Advanced Imaging Medical Group. [AR 00180 - 77]. Dr. Sidney Friedman provided separate reports for each spinal region. [*Id.*]. With respect to Plaintiff's lumbar spine, Dr. Friedman concluded that:

> There are degenerative type disc protrusions at the L4-5
> and L5-S1 level as described above with no demonstration
> of central canal, lateral recess or neural foraminal
> narrowing.
>
> At the L3-4 disc level on the left, there is a more focal
> protrusion which extends the entrance of the left neural
> foramen. It may displace the proximal portion of the
> exiting root, but does not cause central canal narrowing.
>
> There is degenerative disc space narrowing at T11-12 and
> T12-L1.

[AR 00177]. As to his cervical spine, Dr. Friedman stated:

> At the C5-6 disc level, there is an irregular left-sided
> protrusion and spur which indents the thecal sac and
> narrows the entrance to the left neural foramen and causes
> mild left canal narrowing. More mild degenerative type
> charges are noted at the C6-7 level.

[AR 00179].

On June 11, Plaintiff informed Dr. Chon that his back felt better but he still had ongoing pain in the neck and upper back region. [AR 00203]. He also continued to experience considerable aggravation when sitting at a desk. [*Id.*]. Dr. Chon found that

he had mild tenderness to palpation of the neck and no significant increase in pain with range of motion of the neck.  [*Id.*].  Dr. Chon documented moderate tenderness to palpation of his back and a slight increase in pain with range of motion of the back.  [*Id.*].  Dr. Chon reviewed the results of the MRI and determined that Plaintiff should return to physical therapy, and that he should consider other treatment options such as an epidural injection.  [*Id.*].  He kept him on "temporary totally disabled" for the following four weeks.  [AR 00202 - 01].

Plaintiff had his first appointment with Dr. Philip A. Sobol on June 28, 2004.  [AR 00226].  He was referred to Dr. Sobol by his counsel at the time.  [AR 00211].  Dr. Sobol composed a "Primary Treating Physician's Progress Report," dated July 12, 2004, in connection with his review of Plaintiff's medical records and his findings from the June 28 examination.  [AR 00226].  Dr. Sobol diagnosed him with "[c]ervical sprain/strain with a history of bilateral upper extremity radiculitis, and degenerative disc disease at the C5-C6 and C6-C7 levels . . . [and] [l]umbar sprain/strain with history of left lower extremity radiculitis and disc protrusions at the L3-L4, L4-L5 and L5-S1 levels."  [AR 00219].  He noted that Plaintiff "has experienced improvement in his condition; however, he remains symptomatic primarily with prolonged activities as he reports gradual worsening of his symptoms with the performance of his usual and customary duties, which require[] prolonged sitting and computer work."  [*Id.*].  Dr. Sobol recommended that Plaintiff remain on temporary disability while attempting to find additional treatment, such as acupuncture.  [AR 00217].  He also concluded that "at this time, I am unable to determine if there will be any permanent residual disability, nor whether the patient will be able to resume/continue his full previous duties."  [*Id.*].

On July 29, 2004, after seeing Plaintiff, Dr. Sobol instructed him to remain off-work for another four to five weeks.  [AR 00181].  On September 2, 2004, Plaintiff told Dr. Sobol that acupuncture provided him with some relief and he had no interest in receiving epidural injections.  [AR 00182].  He also complained of neck and back pain.  [*Id.*].  Dr. Sobol recommended a short course of chiropractic manipulations and continuation of acupuncture treatment.  He indicated that Plaintiff should remain off-work for another four to six weeks, and determined that a residual disability existed.  [*Id.*].

6

C. <u>Plaintiff's Claim for Disability Benefits and Post-Claim Medical Documentation</u>

Standard received Plaintiff's claim for LTD benefits in September 2004. [AR 00413, 00423 - 26]. In it, Plaintiff related that he stopped working on May 14, 2004, due to a February 9, 2004 work-related injury which led to "neck problems" as well as "degenerative disc disease and bone spurs," which caused "pain in [his] neck, shoulders, [and] arm weakness." [AR 00425]. Plaintiff described his job titles as duties as follows:

> BUSINESS MANAGER – Support Business Unit Director and other managers on Government programs.  Develop proposals, purchase requests, facility operations, in-process new hires, corporate extension to contracts, subcontracts, human resources, industry security.

[*Id.*].

In his initial communication with Standard through a "Long Term Disability Benefits Attending Physician's Statement" dated August 23, 2004, Dr. Sobol stated that: Plaintiff was "unable to perform usual & customary duties due to neck pain radiating both shoulders with numbness and tingling in ® hand [and] lowback pain radiating to left leg preventing patient from prolonged sitting.  Unable to determine limitations at this time pending further testing." [AR 00210].  Dr. Sobol gave conflicting responses in section five of the report by checking on the box indicating that Plaintiff's "condition expected to improve" while also writing a comment that Plaintiff "will probably not improve due to abnormal cervical & lumbar MRI studies [sic]." [*Id.*].

On October 4, 2004, Standard contacted Plaintiff via telephone to obtain an update on the status of his condition. [AR 00435 - 36]. Plaintiff informed Standard that his back still "acts up occasionally but [was] no longer disabling." [AR 00436]. He described his neck as the main problem, stating that the muscles in his neck "burn," his arm gets weak and that he has "tingling." [*Id.*]. However, Plaintiff did not have any surgery scheduled because he wished to treat conservatively. [AR 00436]. Plaintiff also stated that he had stopped attending physical therapy because "WC would only pay for 24 sessions." [*Id.*]. Finally, Plaintiff indicated that "the problem is working @ the computer.  He finds he can't work @ the computer/sit for more than 15-20 minutes before he needs to change position . . . . would like to [return] but [occupation] requires

7

constant sitting." [AR 00435].

Also on October 4, 2004, a Standard vocational consultant, Selvi Springer, conducted an "Own Occupation Review." [AR 00160 - 61]. Based on the information in the file, Ms. Springer concluded that the material duties of Plaintiff's Own Occupation were identified according to the DOT as a "Manager, Department (any industry)." [AR 00161]. The job duties of a "Manager, Department (any industry)" – as delineated in the DOT – are as follows:

> DEPARTMENT HEAD; SUPERINTENDENT. Directs and coordinates, through subordinate supervisors, department activities in commercial, industrial or service establishment: Reviews and analyzes reports, records, and directives, and confers with supervisors to obtain data required for planning department activities, such as new commitments, status of work in progress, and problems encountered. Assigns, or delegates responsibility for, specified work or functional activities and disseminates policy to supervisors. Gives work directions, resolves problems, prepares schedules, and sets deadlines to ensure timely completion of work. Coordinates activities of department with related activities of other departments to ensure efficiency and economy. Monitors and analyzes costs and prepares budget, using computer. Evaluates current procedures and practices for accomplishing department objectives to develop and implement improved procedures and practices. May initiate or authorize employee hire, promotion, discharge, or transfer. Workers are designated according to functions, activities, or type of department managed.

As to the physical demands of that occupation, Ms. Springer set the strength component at "Sedentary" under the DOT criteria because the position, *inter alia*, only requires the employee to exert force up to 10 pounds occasionally. [AR 00160 - 01].

In his "Physician's Report" dated "10-18-04," Dr. Sobol commented that "It is likely the patient will not be able to return to his usual and customary duties as a Business Manager . . . ." [AR 00184]. However, on the same form, Dr. Sobol did not fill out the sections asking him to delineate the Plaintiff's ability/capacity to sit, stand, walk, lift, carry, and engage in other physical activities. Instead, Dr. Sobol simply noted: "unable to determine[,] the patient is *not yet* permanent and stationary as of 10-12-04. [Emphasis in

original]." [*Id.*].

On November 9, 2004, a Standard physician-consultant board certified in orthopedics, Dr. David Waldram, reviewed the file, including Plaintiff's medical records. [AR 00271 - 73]. It was reported that Plaintiff, while "initially treated with medications and chiropractic treatment without improvement," was subsequently started on physical therapy with noticeable improvement." [AR 00273]. Dr. Waldram stated that Plaintiff was "status post lumbar spine strain who later had some irritation in the cervical and upper thoracic area." [AR 00272]. He also noted that Plaintiff had minor changes in reflexes, but had an otherwise essentially normal examination neurologically. [*Id.*]. Dr. Waldram found Plaintiff had some degenerative changes that were not out of character for his age, but had no significant neurological deficits. [*Id.*]. He opined that it would have been reasonable to modify Plaintiff's work activity over a period of 6 to 8 weeks to allow his acute symptomology to subside. [*Id.*]. According to Dr. Waldram, by June 2004, Plaintiff "[sh]ould in all probability [have been] able to return to sedentary to light [-] and probably even some medium [-] activity." [*Id.*]. Dr. Waldram concluded these findings were "consistent with osteoarthritis and a back strain described as occurring in late February, 2004." [AR 00271].

On December 7, 2004, MTC faxed a description of Plaintiff's job to Standard. [AR 00158 - 59]. The job description of a business/office manager lists Plaintiff's duties as involving coordination with MTC corporate officers on employee matters, assisting with contracts and office management. [AR 00158]. That description, while delineating the tasks/duties to be performed, does not indicate any physical requirements or restrictions regarding their accomplishment. [*Id.*]. On December 8, 2004, Ms. Springer performed another vocational review evaluating Plaintiff's own occupation in light of the information in the file, including the job description provided by Plaintiff's employer. [AR 00162]. She confirmed that Plaintiff's occupation fell in the category of sedentary work, which can be primarily performed while seated and requires exertion of no more than 10 pounds occasionally. [*Id.*]. She also noted that "Manager, Department" "is a managerial occupation and allows for maximum self-regulated flexibility in position change while performing the material duties." [*Id.*]. In particular, Springer found that:

Required tasks involving the use of office machinery such

9

> as fax, copier, printer would require position change from
> sitting to standing/walking for brief periods of time. Other
> tasks outlined in the job description provided by the
> employer such as training/education, coordinating main-
> tenance, coordinating ordering of supplies, as well as
> interactions with other supervisors would allow for position
> change as well. The use of telephone headset, which is a
> standard accommodation, would allow for even greater
> flexibility in position change from sitting while performing
> the material duties.

[*Id.*].

On December 10, 2004, Standard initiated another telephone conversation with Plaintiff to discuss the results of Dr. Waldram's review.[2] [AR 00455 - 57]. Standard informed Plaintiff that its physician consultant had reviewed Plaintiff's file and concluded he could perform at least sedentary work. [AR 00457]. Plaintiff then informed Standard that sitting was not his main problem. [*Id.*]. Instead, he indicated that his main problem was that if he sat at a computer for more than 10 minutes, which he did at home, the pain in his neck, right shoulder, and arm increased significantly. [*Id.*]. Plaintiff also stated that repetitive writing, such as paying bills, also caused increased pain in his right hand, shoulder and arm. [*Id.*]. Plaintiff stated he believed he could not work and confirmed he was only treating with Dr. Sobol. [AR 00455 - 56]. Plaintiff further advised that he was receiving $728 a week from his Workers' Compensation carrier, but he expected this would end or decrease once he underwent an Independent Agreed Medical Examination. [AR 00456].

On December 16, 2004, Standard contacted Dr. Sobol's office to set up a time for him to meet with Standard's physician consultant and discuss Plaintiff's ability to perform his duties as a business manager. [AR 00274]. Dr. Sobol's office indicated that Standard should instead send a letter with its questions which Dr. Sobol would answer after Plaintiff's next scheduled appointment on December 22, 2004. [*Id.*]. On December 17, 2004, Standard wrote to Dr. Sobol, providing him with Dr. Waldram's opinion, which concluded that Plaintiff's medical records did not "support inability to perform at the sedentary level of activity." [AR 00275 - 77]. It also informed him that:

> In order for Mr. Salz to qualify for LTD benefits, we need
> to determine if he disabled as defined in the policy under

---

[2] At the time of this interview, Plaintiff indicated that "he was sitting at [the] pool." [AR 00457].

which he is covered for these benefits. We do not insure him for his inability to perform the specific duties of the job he may have performed at MTC Technologies. We insure him for his inability to perform the material duties of his occupation as it exists in the national economy.

[AR 00275 - 76]. Standard asked Dr. Sobol to provide; 1) a narrative statement detailing the specific limitations and restrictions which prevented Plaintiff from returning to his sedentary occupation; and 2) copies of Dr. Sobol's medical records if he disagreed with Dr. Waldram's opinion. [AR 00275].

On January 11, 2005, Dr. Sobol provided Standard with a "Primary Treating Physician's Progress Report" which gave the following diagnosis of Plaintiff's condition:

1. Cervical spine musculoligamentous sprain/strain with right upper extremity radiculitis and degenerative disc disease/bulging, per MRI scan, dated June 2, 2004, with stenosis.

2. Lumbosacral musculoligamentous sprain/strain with left lower extremity radiculitis and degenerative disc protrusion, per MRI scan, dated June 2, 2004.

[AR 00285 - 86] Dr. Sobol also provided the following "work restrictions:"

The patient will require work restrictions to prevent deterioration/worsening or re-injury.

With regard to the cervical spine residuals, the patient is precluded from activities requiring heavy lifting, repetitive motions of the neck and prolonged posturing of the head and neck.

This is based on the abnormal MRI scan, loss of motion, spasm, trigger points and the patient's residual subjective complaints.

With regard to the lumbar spine residuals, the patient is precluded from activities requiring heavy lifting, repetitive bending, stooping and prolonged sitting.

This is based on the abnormal MRI scan, residual spasm, loss of motion and the patient's residual subjective complaints.

[AR 00284]. Dr. Sobol indicated that his understanding was that Plaintiff's job required "essentially continuous sitting while performing his duties which were primarily

administrative, writing and computer work." [AR 00282].

On January 12, 2005, Standard conducted a "Roundtable" review which considered Plaintiff's medical documentation and the findings of the various physicians. [AR 00291]. It was noted that from a vocational perspective, the nature of his occupation "allows for maximum flexibility to change positions, and [a] common ergonomically designed workstation would allow claimant to avoid prolonged positioning or repetitive neck movements." [AR 00290].

On January 14, 2005, Standard wrote a letter to Plaintiff denying his claim. [AR 00462 - 66]. The letter explained the basis of the denial, reciting the relevant policy provisions and identifying the information that contributed to the conclusion that Plaintiff was not entitled to long term disability benefits. Standard's claim decision letter explained that this information was reviewed by a Vocational Case Manager for Standard, who determined that Plaintiff's occupation as a "business manager is classified as sedentary work." [AR 00464]. Importantly, this managerial occupation would "allow for maximum self-regulated flexibility in position changes while performing the material duties," a fact not contested or contradicted by Plaintiff. [*Id.*]. The letter also referred Plaintiff to the Policy's definition of "Own Occupation" and noted that Standard "may look at the way [Plaintiff's] occupation is generally performed in the national economy." [*Id.*].

Based on a review of Plaintiff's medical records and Dr. Waldram's report, Standard concluded that the medical information failed to support Plaintiff's contention that he was unable to perform at a sedentary level of activity. [AR 00465]. Standard added that, based on the medical evidence, "it would have been reasonable to modify his work activity for a period of six to eight weeks from his last day of work to allow his acute symptomology to subside." [*Id.*]. Standard further concluded that the "restrictions and limitations provided by [Dr. Sobol] would not prevent [Plaintiff] from performing the duties of the occupation of Business Manager as this occupation exists in the national economy." [AR 00464]. Furthermore, Standard determined that "even if these restrictions and limitations were found to be supported by the medical evidence, [Plaintiff's] occupation would allow for maximum flexibility to change positions, and with a common ergonomically designed work station he would be able to avoid

12

prolonged posturing or repetitive neck movements." [AR 00463]. Ultimately, Standard determined that based on its review of the available information, "the medical evidence support[ed] that [Plaintiff] would have been capable of performing at the sedentary level of activity at the time [he] stopped work on May 15, 2004." [Id.].

On January 24, 2005, Standard received a "Physician's Report – Ortho/Neuro" from Dr. Sobol dated "1-13-05." Item number 10 therein asks the question: "Based upon objective findings, please indicate below the amount of activity this individual can tolerate in a work day for any employer.  Indicate the functional capabilities of this individual given two breaks, positional changes, and meal break(s)." [AR 00293]. Dr. Sobol noted 6 hours as to sitting and 6 hours as to standing/walking.  Dr. Sobol also wrote that the primary diagnosis was "cervical sprain/strain w/ right upper extremity radiculitis and degenerative disc disease/bulging" and "lumbar sprain/strain w/ radiculitis left lower extremity and multi-level disc bulges . . . ." [AR 00294]. He concluded that:

> The patient has permanent work restrictions with preclude
> him from heavy lifting, repetitive bending and stooping,
> prolonged sitting and repetitive movements/prolonged
> postures of the head/neck.  As a result of these restrictions,
> the patient is physically incapable of returning to his usual
> and customary job duties as a Business Manager due to the
> prolonged sitting."

[AR 00292].

In a letter dated February 1, 2005, Standard informed Plaintiff that it had received additional medical information from Dr. Sobol but that it had not received any concomitant request from him to reconsider its prior ruling.  [AR 00471]. Nevertheless, Standard did review the newly provided material and concluded that:

> It is insufficient to allow us to overturn our previous
> decision. This is because this new information provides the
> same restrictions and limitations that were provided by [Dr.
> Sobol] in the past and that resulted in our initial determin-
> ation that you could perform your sedentary occupation as
> a Business Manager on a full time basis as this occupation
> exists in the national economy.

[Id.].

On March 17, 2005, Standard received a letter from Plaintiff's counsel's paralegal indicating that Plaintiff intended to appeal his denial of benefits after Standard provided a

copy of the entire administrative record and other documents. [AR 00472 - 74].  On April 21, 2005, Standard responded by letter and provided a copy of the administrative record with the applicable disability policy. [AR 00484].  Standard agreed not to conduct the independent review of his claim until Plaintiff submitted additional documents. [Id.].

In July, 2005, Plaintiff contacted Standard in order to request a 45-day extension of time to submit additional documentation in support of his appeal.  Standard agreed to this request, and granted Plaintiff a 45-day extension. [AR 00485].  Plaintiff contacted Standard again in August, 2005, to request another 45-day extension to submit the additional documentation. [AR 00492].  Standard also agreed to this extension, which caused the documentation to be due on September 23, 2005. [Id.].

On September 22, 2005, Standard received the "additional" records to be considered as part of Plaintiff's appeal. [AR 00500 - 02].  These records consisted primarily of: a letter from Dr. Sobol dated January 13, 2005; a report regarding an Independent/Agreed Medical Examination by Roger S. Sohn, M.D., in Plaintiff's Workers' Compensation matter; a Rheumatologic Consultation by Allen Salick, M.D.;[3] a

---

[3] Dr. Salick found that Plaintiff had a normal range of motion in both his cervical and lumbar spine, with pain at the extremes. [AR 00347].  He also concluded that Plaintiff had a normal range of motion in the joints of his upper and lower extremities. [Id.].

Dr. Salick also performed electrodiagnostic testing of Plaintiff which showed that:

> [The] electromyogram (EMG) . . . sampl[ed] proximal and distal muscles of both upper and lower extremities, as well as the entire paraspinal chain including cervical, thoracic, and lumbar areas. This was performed to rule out painful inflammatory processes like infectious or inflammatory myositis, polymyositis, dermatomyositis, and also to rule out neuropathic symptoms of radiculopathy, cervical as well as lumbar, that might mimic widespread pain. Other conditions that might cause widespread pain would be detected by electromyography would be a peripheral neuropathy, especially one in an advanced stage.
>
> Sampling was performed both at rest and during voluntary activity, looking for abnormal interference patterns and also looking for the type of myopathic or neuropathic units that might explain such widespread pain.
>
> The study was normal. Electrical silence was found at rest. On voluntary activity, there was a normal interference pattern. There was no increased polyphaasicity and no active denervation seen. There were also no myopathic or neuropathic units. No high frequency discharges were seen and no significant atrophy was noted.
>
> A separate study was performed of the thoracic paraspinals. This is an area that requires special expertise to that the examiner can avoid puncturing the thoracic cavity, causing a pneumothorax. In any event, this study was normal.

[AR 00346].  Dr. Salick concluded that he provided Plaintiff with a "rheumatological evaluation for his

Job Analysis by Allen Griffiths, dated February 7, 2005 (also apparently done for the Workers' Compensation case);[4] a "daily journal" kept by Plaintiff; and a July 2, 2005 Notice of Social Security Disability Award. [AR 00500 - 02].

On October 25, 2005, Dr. Waldram conducted a further review of Plaintiff's medical records. [AR 00382 - 83]. Dr. Waldram noted that, according to a chiropractor in Dr. Sobol's office, Plaintiff "had mild decreased range of motion in the lumbar spine and minimal decreased range of motion in the cervical spine." [AR 00383]. Dr. Sobol's January 13, 2005 report stated that Plaintiff could perform the "light physical demand category of work with no sitting greater than six hours or combination of sitting and standing greater than six hours." [Id.]. Furthermore, he indicated that Plaintiff had an "80%+ range of motion of the cervical and lumbar spine." [AR 00382]. With respect to the rheumatologic evaluation conducted by Dr. Salik, Dr. Waldram noted that Plaintiff was diagnosed with discogenic disease of cervicolumbar with no rheumatologic disease. [Id.]. The examination "was normal with a normal range of motion, no tenderness, and a normal neurologic exam." [Id.].

Dr. Waldram observed that Plaintiff was also seen by an orthopedic surgeon (i.e. Dr. Sone[5]) on February 1, 2005. [Id.]. That physician found Plaintiff's range of motion to be minimally diminished, and indicated that Plaintiff experienced only intermittent slight neck ache and minimal to slight discomfort in the lumbar region. [Id.]. The surgeon recommended no heavy lifting relative to the cervical spine and no very heavy lifting relative to the lumbar spine. [Id.].

In his report, Dr. Waldram stated that reviewing all of this new information did not change his opinion regarding Plaintiff's ability to function in a sedentary to light physical demand category without limitations. [Id.]. Dr. Waldram noted that according to the DOT and the vocational information which had been provided to him, Plaintiff's occupation was sedentary "with the ability to maximize self regulated flexibility and

---

chronic musculoskeletal pain;" however, his tests showed that he had "no fibromyalgia, connective tissue disease or a significant neurologic component." [AR 00345].

[4] In the Job Analysis, which was prepared from information provided by both the Plaintiff and an "employer representative," it was noted as to sitting that it was "continuous – at desk while performing the majority of job functions. Continuous sitting to 2 hours." [AR 00166].

[5] On page AR 00384, Dr. Sone's name is spelled "Sohn."

changes." [*Id.*]. Accordingly, Dr. Waldram concluded that "the medical information does not support that the claimant cannot do sedentary work." [*Id.*].

On November 7, 2005, Standard's vocational case manager, Ms. Springer, reviewed the file again, including the February 7, 2005 Job Analysis provided with the appeal. [AR 00172 - 73]. It was noted that Plaintiff, his attorney, and his employer had reviewed and approved the Job Analysis and found it to be accurate. [AR 00173]. Ms. Springer identified Plaintiff's Own Occupation as "Manager, Department," which required a sedentary level of physical demand. [*Id.*]. Ms. Springer stated that the Job Analysis confirmed the fact that the Plaintiff's job was "sedentary and managerial in nature." [*Id.*]. Thus, the Job Analysis report was consistent with Ms. Springer's original determination that Plaintiff's own occupation "would typically allow for maximum self-regulated flexibility in position change as it is performed in the national economy." [*Id.*].

On November 21, 2005, Standard wrote to Plaintiff, upholding its earlier decision to deny his disability claim. [AR 00513 - 17]. The letter indicated that Standard considered, among other information, Dr. Sobol's January 13, 2005 letter and report, the February 1, 2005 AME report by Dr. Sohn, the Comprehensive Rheumatologic Consultation from Dr. Salick, as well as the SSDI award letter and the February 7, 2005 Job Analysis. [AR 00515 - 16]. Standard explained that Dr. Waldram reviewed the additional information submitted by Plaintiff. [AR 00514]. Based on this review, Standard reiterated that the letter and Physician's Report dated January 13, 2005 were insufficient to cause Standard to change its previous decision. Standard further concluded that the Comprehensive Rheumatologic Consultation showed a normal neurological exam with normal range of motion and no rheumatologic disease. Standard determined that the "AME" report indicated that Plaintiff had minimal diminished range of motion. [*Id.*]. Standard considered Plaintiff's daily journal and noted that even though Plaintiff "may have continued complaints of pain, the medical evidence [did] not support limitations and restrictions which would preclude him from performing his own occupation." [*Id.*]. Standard also considered Plaintiff's approval for SSDI benefits, and noted that Plaintiff's eligibility for ERISA LTD benefits was based on all available documentation submitted on his behalf rather than the decision of the Social Security Administration ("SSA") that he qualified for disability under their rules and regulations. [*Id.*]. Standard informed

Plaintiff that a Vocational Case Manager had reviewed the Job Analysis completed by a representative of Career Options, Inc., along with the job description from Plaintiff's employer. [*Id.*]. Standard noted that in determining the duties of Plaintiff's Own Occupation, Standard was permitted to look at the way his occupation is generally performed in the national economy. [*Id.*]. Standard explained that the additional information did not change Standard's opinion "regarding the physical requirements of [Plaintiff's] occupation as a Business Manager as it exists in the national economy." [*Id.*].

In addition to the aforementioned reconsideration of Plaintiff's claim for benefits, Standard also conducted an Independent Review of the decision to deny Plaintiff's Claim. Standard's Quality Assurance Unit reviewed all of the information in Plaintiff's claim file. None of the individuals involved in the original claim decision or the subsequent reconsideration were involved in this independent review of Plaintiff's claim.

On December 7, 2005, a second physician consultant, Dr. Mark Shih, board certified in physical medicine and rehabilitation conducted a review of Plaintiff's medical records. [AR 00388 - 90]. Dr. Shih noted that restrictions against heavy lifting or prolonged fixed neck positions appeared appropriate. [*Id.*]. However, Dr. Shih found, "there has not been a focally identified neurologic deficit nor pattern of radiculopathy established with regard to his diagnosis." [AR 00389]. Moreover, Dr. Sobol's June 28, 2004 examination showed range of motion, strength, and neurologic evaluation "within a level of expected presentation that he would be capable of full time sedentary level occupations." [AR 00388 - 89]. Furthermore, Dr. Shih noted that as of the time of his medical evaluations, Plaintiff was "perfectly capable of full time work within a sedentary to light level work description." [AR 00388]. In conclusion Dr. Shih opined that Plaintiff may even have been "capable of medium level occupations on a full time basis." [*Id.*].

On December 14, 2005, Standard's Quality Assurance Unit wrote to Plaintiff's counsel's paralegal concerning the results of its independent review. [AR 00529 - 24]. The Unit concluded that his claim "must remain denied." [AR 00529]. The letter advised that Plaintiff's job title while employed at MTC was "Business Manager," which is a sedentary occupation. [AR 00528]. Standard acknowledged that Plaintiff was

17

eventually diagnosed by Dr. Sobol on December 27, 2004 with musculoligamentous sprain/strain injuries, degenerative disc disease with mild bulges, and degenerative joint disease with mild stenosis. [AR 00526]. Standard also acknowledged that Plaintiff was precluded from heavy lifting, repetitive motions of the neck, prolonged posturing of the neck, repetitive bending and stooping, and prolonged sitting. [AR 00525]. Nonetheless, Standard explained that both of its consulting physicians had reviewed all of the medical records and assessed Plaintiff as (1) benefiting from the ability to change positions as needed and (2) capable of sedentary work prior to August 14, 2004, the end of the Benefit Waiting Period. [AR 00525]. Standard also considered the fact that Plaintiff received worker's compensation and Social Security disability benefits, but explained that:

> there are many types of disability programs, both governmental and private, which use different rules. A person may receive benefits under another program and still not be entitled to group LTD Benefits. We cannot rely on the determinations of claim adjudicators whose decisions are made within the procedural rules or laws of other benefit programs. We must evaluate your eligibility for LTD Benefits, given the terms of the Group Policy and the information available to us in the claim file.

[AR 00525]. Therefore, while Standard accepted that Plaintiff had physical limitations and restrictions, it concluded that they did not impair his ability to work in his Own Occupation as it was generally performed in the national economy.

## III. Analysis

### A. Standard of Review

ERISA allows an individual who is denied benefits under his or her employer's group long term disability policy to contest that denial in federal court. *See* 29 U.S.C. § 1132(a)(l)(B); *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). A denial of benefits challenged under ERISA is generally reviewed under a deferential abuse of discretion standard if the benefit plan gives the administrator discretionary authority to determine eligibility for benefits and to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*). Here, the Policy's terms plainly give Standard such discretionary authority. *See* page 3, *supra*. As Plaintiff has not attempted

to add any additional evidence here (nor made any arguments that any procedural irregularities prevented him from doing so), the scope of review is limited to the administrative record. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir.) (*en banc*), *cert. denied*, 528 U.S. 964 (1999); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008).

A delineation of the standard of review in the context of a denial of long-term disability benefits governed by ERISA is given in *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673-76 (9th Cir. 2011); and rather than reinventing the wheel, that discussion is quoted here at length:

> We have gradually refined and restated our standard of review. In *Horan v. Kaiser Steel Retirement Plan* [947 F.2d 1412 (9th Cir. 1991)], applied in *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, [370 F.3d 869 (9th Cir. 2004)] and our more recent decision in *Sznewajs v. U.S. Bancorp* [572 F.3d 727 (9th Cir. 2009)], we held that "[a] decision is not arbitrary unless it is 'not grounded on any reasonable basis.'" [947 F.2d at 1417.] This "*any* reasonable basis" test is no longer good law when as in this case an administrator operates under a structural conflict of interest.
>
> The administrator of the plan before us has a conflict of interest, as the term is used in ERISA cases, because the insurer acts as both funding source and administrator. In our decision in *Abatie v. Alta Health*, we held that if a plan gives discretion to an administrator operating under a conflict of interest, the "conflict must be weighed as a factor in determining whether there is an abuse of discretion." [*Id.*] Procedural errors by the administrator are also "weighed in deciding whether the administrator's decision was an abuse of discretion." [*Id.*] We held in *Saffon v. Wells Fargo & Company Long Term Disability Plan*, [522 F.3d 863, 868-69 (9th 2008)], that we apply different levels of skepticism on account of conflicts of interest, depending on various factors such as inconsistent reasons for denial or evidence of malice. We held that "when reviewing a discretionary denial of benefits by a plan administrator who is subject to a conflict of interest, we must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference we accord the administrator's decision." [*Id.* at 868.]
>
> Subsequently, the Supreme Court issued its own refinement, superseding ours to the extent that there is any difference. *Metropolitan Life Insurance Co. v. Glenn*, [554 U.S. 105, 108 (2008)], holds that where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own

pocket . . . this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." Under *Glenn*, the conflict of interest must be "weighed as a factor" but does not convert abuse of discretion review into de novo review. The weight given the factor varies. The Court emphasized that its "elucidation of *Firestone's* standard does not consist of a detailed set of instructions" and, importing language from the standard of review of administrative agency decisions, "there 'are no talismanic words that can avoid the process of judgment.'" [*Id.* at 119.]

The Supreme Court further refined the standard of review in its decision this year in *Conkright v. Frommert*, holding that "a single honest mistake in plan interpretation" administration does not deprive the plan of the abuse of discretion standard or justify de novo review for subsequent related interpretations. [130 S.Ct. 1640, 1644 (2010).]    The Court emphasized that under *Glenn*, "a deferential standard of review remains appropriate even in the face of a conflict." [*Id.* at 1646.]    *Conkright* noted, though, that "[a]pplying a deferential standard of review does not mean that the plan administrator will prevail on the merits." [*Id.* at 1651.] What deference means is that the plan administrator's interpretation of the plan "will not be disturbed if reasonable."

It is much easier to state the words of the formula for the standard of review than to say what the formula means in practice. We now know that the administrator's decision cannot be disturbed if it is reasonable. And we know that even an unqualified abuse of discretion standard of review does not mean that the administrator necessarily prevails on the merits, because "no talismanic words . . . can avoid the process of judgment." We know that we are supposed to "weigh" a conflict of interest in deciding how skeptical to be of the administrator's decision, according varying weight to it depending on other factors, but that is a hard standard to apply. "Weighing" is a metaphor. Real weighing is done with a scale. For fine work one may gradually add two gram brass weights on one side of the scale, or use the one gram slider, until the trays on both sides are level. Because this connotes careful, precise, scientifically accurate results, it is a comforting metaphor for judicial work. But unlike weighing potassium bromide and potassium ferricyanide in a traditional darkroom, our "weighing" is done without a scale, without the little brass weights, and without a substance to weigh that has any weighable mass.

. . . .

Where, as in this case, the plan gives the administrator discretion, and the administrator has a conflict of interest, we are to

judge its decision to deny benefits to evaluate whether it is reasonable. Reasonableness does not mean that we would make the same decision. We must judge the reasonableness of the plan administrator skeptically where, as here, the administrator has a conflict of interests. Even without the special skepticism we are to apply in cases of conflict of interest, deference to the plan administrator's judgment does not mean that the plan prevails. "Deference" is not a "talismanic word[ ] that can avoid the process of judgment." [554 U.S. at 119.] The conflict of interest requires additional skepticism because the plan acts as judge in its own cause.

The meaning of "abuse of discretion" is elucidated in our en banc decision in *United States v. Hinkson* [585 F.3d 1247 (9th Cir. 2009)]. There we held that the test for abuse of discretion in a factual determination (as opposed to legal error) is whether "we are left with a definite and firm conviction that a mistake has been committed," and we may not merely substitute our view for that of the fact finder. [*Id.* at 1262.] To do so, we consider whether application of a correct legal standard was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." [*Id.*] That standard makes sense in the ERISA context, so we apply it, with the qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest. [Footnotes omitted.]

As held by the Supreme Court in *Glenn*, a conflict of interest is merely one consideration in determining the correctness of a decision amid "several different, often case-specific, factors, reaching a result by weighing all together." 554 U.S. at 117. In addition to an administrator's conflict of interest, in conducting an abuse of discretion review, a court should also consider other case-specific factors such as "the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any." *See Montour*, 588 F.3d at 630 (internal quotation marks omitted).

The conflict of interest factor will prove most important where the circumstances suggest a likelihood that it actually had an effect on the benefits decision. *See Glenn*, 554 U.S. at 117; *see also Abatie*, 458 F.3d at 968-69. In other words, a court "may 'weigh'

the conflict 'more heavily' if there's evidence that the administrator has given 'inconsistent reasons for denial,' has failed 'adequately to investigate a claim or ask the plaintiff for necessary evidence,' or has 'repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly.'" *Saffon*, 522 F.3d at 868 (quoting *Abatie*, 458 F.3d at 968). Nevertheless, after *Abatie*, "plaintiffs will have the benefit of an abuse of discretion review that <u>always</u> considers the inherent conflict when a plan administrator is also the fiduciary, even in the absence of 'smoking gun' evidence of conflict." *Abatie*, 458 F.3d at 969 (emphasis added); *see also Montour*, 588 F.3d at 631 (describing *Abatie* as having abrogated a line of cases, including *Jordan*, to the extent that they had "directed reviewing courts to disregard structural conflicts of interest and affirm an administrative decision 'grounded on any reasonable basis,' unless a plaintiff could produce sufficient evidence that the conflict was 'serious'") (quoting *Abatie*, 458 F.3d at 966-67, 969).

As this Court observed when it first decided this case (and Plaintiff not having presented anything to the contrary on this second go-round), there is no evidence here of institutional or pervasive bias. Instead, Plaintiff again argues (as he had before) that Standard ignored a social security ruling in his favor and his own actual job requirements and duties, and that these factors should cause the Court to look upon Standard's conflict of interest with special suspicion. As noted above, the Ninth Circuit instructed this Court to take into consideration, among other things, that Standard had not analyzed the distinctions between the Social Security award and Plaintiff's right to disability benefits and had not paid sufficient attention to Plaintiff's actual job duties.[6]

A. The Social Security Award

As noted in this Court's earlier ruling, Standard was not bound by any prior award by the SSA. *See e.g. Madden v. ITT Long Term Disability Plan for Salaried Employees,*

---

[6] The "Own Occupation" definition in play in this case is the same as in *Kaiser v. Standard Ins. Co.*, No. C-05-4284 SC, 2007 U.S. Dist. LEXIS 2239, *7-10 (N.D. Cal. Jan. 11, 2007), where the district court declined to disturb Standard's use and application of that definition. The Ninth Circuit affirmed that decision in a memorandum disposition. *See* 2008 U.S. App. LEXIS 26753 (9th Cir. 2008) ("[T]here was no abuse in Standard's use of the 'own occupation' limitation, or in its decision to rely upon its consultants rather than upon the opinions of Kaiser's physicians, or, ultimately, in its consideration of the consulting physicians' opinions during its handling of the review process."); *see also* Fed. R. App. P. 32.1(a) (barring the prohibition of citation to unpublished opinions issued on or after January 1, 2007).

914 F.2d 1279, 1285-86 (9th Cir. 1990) (holding plan fiduciary did not abuse discretion in crediting medical evidence in record showing lack of disability notwithstanding social security award in favor of the claimant), *cert. denied*, 498 U.S. 1087 (1991). Nevertheless, in *Montour*, the Ninth Circuit ruled that "complete disregard for a contrary [SSA] conclusion without so much as an explanation raises questions whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'"[7]  *Montour*, 588 F.3d at 635.  Standard did not "completely disregard" the Social Security award in this case.  However, it did fail to exhaustively explain the distinction between the Social Security award and its own conclusion as to the level of Plaintiff's disability.

In *Montour*, the administrator had "acknowledged the SSA's decision but did not articulate why the SSA might have reached a different conclusion." *Id.* (citing *Glenn v. MetLife*, 461 F.3d 660, 671 n.3 (6th Cir. 2006) for the observation that "there is a distinction between *mentioning* a contrary determination and *discussing* it") (emphasis in *Montour*)).  *Montour* also commented that "[o]rdinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just

---

[7] However, the Supreme Court has held that it is error to automatically equate the statutory regimes embodied in ERISA and the Social Security Disability Act. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003). Specifically, it noted:

> The Social Security Act creates a nationwide benefits program funded by Federal Insurance Contributions Act payments, . . . and super-intended by the Commissioner of Social Security.  To cope with the "more than 2.5 million claims for disability benefits [filed] each year," . . ., the Commissioner has published detailed regulations governing benefits adjudications.
>
> . . . .
>
> In contrast to the obligatory, nationwide Social Security program, "nothing in ERISA requires employers to establish employee benefits plans.  Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." . . . . Rather, employers have large leeway to design disability and other welfare plans as they see fit.  In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria.  "The validity of a claim to benefits under an ERISA plan," on the other hand, "is likely to turn," in large part, "on the interpretation of terms in the plan at issue."  It is the Secretary of Labor's view that ERISA is best served by "preserving the greatest flexibility possible for . . . operating claims processing systems consistent with the prudent administration of a plan." . . . . Deference is due that view.

*Id.* at 833-34.

the definitions employed but also the medical evidence upon which the decisionmakers relied." *Id.* at 636. The court also took the administrator defendant in that case to task for failing to advise the plaintiff "that further documentation, such as the ALJ's decision [supporting the SSA award] or the underlying administrative record" would facilitate its own review. *Id.* at 637. Like this case, the administrator in *Montour* addressed the contrary social security determination, in somewhat boilerplate terms, as "a consideration and part of the totality of the evidence[,]" while its own decision "must be based on the weight of the evidence in this file." *Id.* Nevertheless, in *Montour*, the Ninth Circuit did not hold that a failure to provide a full explanation for the difference between the SSA's finding of disability and an ERISA plan administrator's finding of non-disability under a LTD benefits policy was reversible error *per se*. Rather, it stated that:

> While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was "the product of a principled and deliberative reasoning process." *See MetLife I*, 461 F.3d at 674; *see also MetLife II*, 128 S. Ct. at 2352; *cf. id* at 2361 (Scalia, J., dissenting). In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence. *See MetLife II*, 128 S. Ct. at 2355 (Roberts, C.J., concurring in part and concurring in the judgment).

588 F.3d at 635.

Yet, in certain key respects at least, this element is not as favorable to Plaintiff here as it was to the plaintiff in *Montour*. First, in that case there was evidence that the administrator had played a proactive, or in fact forceful, role in prompting the plaintiff to even apply for a social security award. *Id.* Second, the Social Security award had been issued *before* the plan administrator had denied the plaintiff any ERISA LTD benefits. *Id.* Third, the administrator had previously found the plaintiff disabled and paid him benefits for two years before deciding without any evidence of an improvement on plaintiff's part that he was no longer disabled. All of those facts are missing from this case. Plaintiff has never argued (and there is otherwise herein no evidence of) the first or third factors; and the evidence is fairly clear that Standard did not learn about Plaintiff's Social Security award until *after* it had rendered at least its initial decision in January

2005. In fact, Plaintiff admits that he did not provide information concerning his social security award (or the February 7, 2005 independent vocational assessment, upon which his other objections largely rely) until September 21, 2005.

Still, the fact remains that Standard never fully discussed, or explained to Plaintiff, why there would be a distinction between his Social Security award and any right to benefits under his employer's LTD Policy, except to note that there are differences in the applicable rules and standards for evaluating claims under an ERISA benefits plan versus a determination of disability under the Social Security Act. Nevertheless, if this were the only factor (in addition to the structural conflict of interest) here and the Court were to rule in Plaintiff's favor, the Court would essentially be holding that a plan administrator *always* abuses its discretion when it fails to give a detailed explanation of the distinctions between Social Security awards and rights to benefits under private disability plans.[8] Neither *Montour* nor any other case that the Court is aware of can be understood to establish that rule.[9]

This Court would not find that Standard's failure to provide a full explanation for the difference between the SSA's conclusion and its determination regarding Plaintiff's disability warrants overturning Standard's decision denying LTD benefits herein. First, unlike the situation in *Montour*, Standard reached its initial decision to deny Plaintiff's claim before any contrary determination was reached by the SSA. Second, also unlike *Montour*, Plaintiff had not previously been found to be (nor had been treated by the plan administrator as) disabled in regards to his ability to perform his own occupation. Third, at the time Standard rendered its decisions, the Ninth Circuit had not indicated (as it eventually did in *Montour*) that an analysis and meaningful discussion of a contrary SSA decision would be a practice which is strongly encouraged in this Circuit. Fourth, Standard did not ignore the SSA's decision after it was apprised of its existence; although

---

[8] Because *Glenn* and *Montour* only recently emphasized a plan administrator's obligations to more fully explain contrary Social Security awards, years after Standard actually made its decisions in this case, this factor, by itself, would not appear to call for the Court to "weigh" the *conflict of interest* factor "more heavily." In other words, it is not necessarily indicative or demonstrative of a conflict of interest. Again, however, both the conflict of interest and the contrary Social Security award would always remain factors in the Court's analysis, just not necessarily *connected* factors.

[9] In *Salomaa*, the Circuit faulted the plan administrator's total failure to even mention the contrary Social Security award in its evaluation of the plaintiff's LTD claim. 642 F.3d at 679.

Standard's discussion of it was admittedly limited.[10]  However, at the time Standard gave its explanation, it was an entirely correct exposition of the then-current law being, basically, an adaption of the Supreme Court's language/reasoning in *Black & Decker Disability Plan*, 538 U.S. at 830-31.  Fifth and finally, the failure of a plan administrator to completely articulate the bases for reaching a different conclusion than the SSA (while certainly a factor to consider) does not by itself preclude affirming the administrator's decision even given the presence of a structural conflict of interest.  *See e.g. Seleine v. Flour Corp. Long-Term Disability Plan*, 409 Fed. Appx. 99, 101 n.1 (9th Cir. 2010) ("Although [the plan administrator] failed to explain why it reached a different conclusion than the Social Security Administration, we are satisfied that such failure did not taint the decisionmaking process given significant differences between the benefits determinations under the Social Security Act and under an ERISA plan.  *See Black & Decker Disability Plan*, 538 U.S. at 832-34.").

B. <u>Plaintiff's Actual Duties</u>

The Ninth Circuit commented in its Ruling that Standard should have "analyze[d], in a reasoned and deliberative fashion, what the claimant actually does before it determines what the 'Material Duties' of a claimant's occupation are." 2010 U.S. App. LEXIS 11103 at *3.  However, the record is relatively clear that Standard did just that, if what the Ninth Circuit meant is that Standard was to have considered Plaintiff's job *responsibilities*.[11]  Standard considered job descriptions from Plaintiff's employer and from Plaintiff himself (which he found were "accurate"), and it fully accepted those descriptions for purposes of its assessment of his claim.  *See e.g.* AR 00158 - 59, AR 00162, AR 00163 - 68, AR 00172 - 73, AR 00425.

If what the Ninth Circuit was raising was the failure to analyze "what the claimant actually does" (meaning the *manner* in which Plaintiff himself accomplished those job responsibilities and tasks, *e.g.* the amount of time he typically sat at a computer doing his work before his injury, *etc.*), again one would be at a loss to understand what the Circuit

---

[10] *See e.g.* Standard's December 14, 2005 correspondence cited on page 18, *supra*.

[11] As noted above, "Material Duties" in the policy means "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted."

panel meant by that remark since the record clearly does contain references as to how he carried out those duties, at least in terms of the physical requirements. *See e.g.* "Job Analysis" AR 00163 - 68. Further, the record is clear that Standard did consider items such as the "Job Analysis" in its decisions herein. *See e.g.* AR 00173.

What Standard did not do was to rely *exclusively* on the manner in which Plaintiff himself had previously discharged the duties of a Business Manager to determine his ability to perform the "Material Duties of his Own Occupation" under the Policy. Standard's approach was not in error unless one were to assume that the *manner* in which a claimant has historically performed his or her job requirements is what is covered by the term "Material Duties" in the LTD policy. The Ninth Circuit did not explicitly reach that conclusion in its Ruling (if that indeed was its intent). Therefore, Standard did not err at all in this regard, much less abuse its discretion.[12]

Additionally, the "Material Duties" factor in the Policy arises in the context of the employee's "Own Occupation." *See* pages 2-3, *supra.* Under the specific language of that Policy, Standard is allowed to do the following: "In determining your Own Occupation, we are not limited to looking at the way you perform your job for your employer, but we may also look at the way the occupation is generally performed in the national economy." *See* AR 00017. Here, there is evidence in the AR (for example from Selvi Springer, a vocational consultant) as to the way the duties of the Business Manager position are "generally performed in the national economy. *See e.g.* AR 00173 - 72.

---

[12] In its previous ruling, this Court similarly took the position that:

> [t]he conclusions of Standard's physician consultants – and Standard – could only be said to be flawed if they were assessing Plaintiff's restrictions based upon an erroneous understanding of Plaintiff's job requirements. Therefore, Standard's decision in this matter was only arbitrary and capricious if its determination of Plaintiff's "Own Occupation" was clearly erroneous. If it permissibly relied upon the Dictionary of Occupational Tables in reaching that determination, the Court would be hard-pressed to conclude that its determination was clearly erroneous or that it acted in an arbitrary and capricious manner.

Docket No. 45 at 9. Even if the Court discards the "clearly erroneous" standard from that statement, Plaintiff still must demonstrate that Standard erred in its understanding and application of the "Own Occupation" and "Material Duties" definitions. Though Plaintiff is again critical of Standard's reliance on the DOT (a principal basis for Plaintiff's disagreement with the use of the DOT is his assertion that the use of computers has proliferated across the economy, and presumably especially in connection with managerial responsibilities, since 1991), he cites no controlling case prohibiting its use and, in fact, the Ninth Circuit *in this case* did not even go so far as to rule that Standard was conclusively prohibited from relying upon it.

Thus, the fact that Plaintiff normally executes most of the job requirements while sitting does not mean that those duties must be performed that way or be treated for the ERISA analysis as only being performed that way.[13]

### C. "Sedentary" Job Classification

The Ninth Circuit also found reason to take issue with Standard's description of Plaintiff's "Own Occupation" as a "sedentary" one and with the conclusion that, as a manager, he had "maximum self regulated flexibility in position change." 2010 U.S. App. LEXIS 11103 at *3. The reason the Ninth Circuit gave for questioning Standard's assessment of Plaintiff's position as a "sedentary" one is because the "sedentary" classification, as it is used in the DOT under the Ninth Circuit's interpretation, means that the work "involves sitting most of the time," whereas Standard had acknowledged that Plaintiff could not sit for a prolonged period of time in a fixed position. *Id.* Although that is a curious sort of analysis, given the fact that the description of a job and the ability of a person to perform a job are seemingly separate considerations, the Ninth Circuit nevertheless concluded that Standard had been "unreasonable" in this regard. However, it should be noted that, as used in the DOT, the term "sedentary" is a *strength* rating. *See* Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer ("The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy."). While the DOT does state that "Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time," being classified as "Sedentary work" does not necessarily mean that the employee is actually required to sit most of the time. For example, if an employee at work is absolutely free to stand, walk, sit, lie down or be in any physical position that he or she desires at any given time and is not required to lift any substantial weight or maintain any production rate pace, that job would still be categorized as "Sedentary" because that work requires the least amount of physical strength. By being labeled "Sedentary," it does not mean that the employee is *required* to sit in order to perform his or her duties. *See cf. Aluisi v. Elliott Mfg. Co.*, 672 F. Supp. 2d 1068, 1078 (E.D. Cal. 2009) (noting a

---

[13] As noted by Ms. Springer, for example, "[t]he use of commonly available items such as a telephone headset and ergonomic workstation" could free Plaintiff from any sitting activities allowing him to change positions at will and to achieve a level of comfort at the workplace. *See* AR 00173.

determination from a vocational consultant that the plaintiff's general manager occupation was "sedentary, including the ability to change positions at will").

Similarly, it would seem to be common sense, if nothing else, that an individual acting in a managerial capacity would be able to change his positioning as needed in order to avoid discomfort, *i.e.* "maximum self-regulated flexibility in position change." This would be especially so here where nothing in the delineations of job duties of a MTC "Business Manager" indicate any restrictions or requirements vis-à-vis physical positioning to accomplish the job's duties. There is nothing in the AR (and Plaintiff has never argued or presented any evidence) that, as a Business Manager at MTC, Plaintiff did not actually have "maximum self-regulated flexibility" to change positions to avoid discomfort. Finally, there was the evidence from the vocational consultant in regards to her evaluations of the Business Manager position both at MTC and in the national economy generally in regards to flexibility to physically change positions, plus her statements regarding the "use of commonly available items such as a telephone headset and ergonomic workstation . . . [to] allow for even greater flexibility in position change from sitting while performing the material duties of the occupation." *See e.g.* AR 00173.

Nevertheless, this Court is still left with the Ninth Circuit's determination that Standard had acted unreasonably in reaching its conclusion. Even if this Court is bound to consider Standard's action "unreasonable" in this regard because of the Ninth Circuit's approach to the issue, Standard's actions do not appear to be *so* unreasonable that it could be said that Standard has abused its discretion, even in conjunction with the other factors addressed herein.

D. Paper Review

Noting that the list of "facts and circumstances" identified by the Ninth Circuit was "nonexhaustive," Plaintiff also faults Standard for not performing a functional capacity evaluation or an independent medical evaluation, despite the fact that it had the right to under the plan and Plaintiff had agreed to sit for such an assessment. *See Montour*, 588 F.3d at 630 (noting as one factor "that frequently arise[s] in the ERISA context," "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records"). Yet, Plaintiff has not sufficiently explained why he feels Standard had any

duty to perform a functional capacity evaluation or independent medical evaluation when Standard in fact accepted as true all of Plaintiff's treating physicians' medical assessments. It simply reached a different conclusion from those assessments because it understood that Plaintiff had a sedentary managerial job (which he has never disputed), in which (because of his managerial status) he had "maximum self-regulated flexibility in position change while performing the material duties." AR 00161 - 62.

However, Standard still might conceivably be faulted in connection with this issue if its failure to sufficiently consider Plaintiff's own actual duties infected its paper review process by way of misleading the physician reviewers about the nature of Plaintiff's job and its attendant tasks. *See Montour*, 588 F.3d at 634 (faulting paper review process where it was not clear the defendant had presented the reviewing physicians "with all of the relevant evidence"). However, there is no evidence that Standard failed to disclose any material medical or job-related evidence to the physician reviewers or anyone else, and/or failed to consider materials actually presented to it.

### E. Other Evidence Germane to Conflict of Interest

Standard's multiple levels of review – and in particular its Quality Assurance Unit's review – of its claims processing suggests that it had efforts in place to "assure accurate claims assessments," unlike the situation in *Montour*. *See* 588 F.3d at 634. As observed in *Glenn*, 554 U.S. at 117, the structural conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken steps to reduce potential bias and to promote accuracy . . . ."

### F. Remaining Observations

The remainder of the analysis from the Court's initial determination in this matter is otherwise unchanged. In making its initial determination in this case, Standard reviewed Plaintiff's initial claim for benefits, his Attending Physician's Statements, conducted two telephonic interviews with Plaintiff, performed a vocational assessment and vocational review, requested copies of all information regarding Plaintiff's workers' compensation claim and Plaintiff's medical records from his treating and consulting physicians, discussed Plaintiff's situation with a nurse case manager, and reviewed Dr. Sobol's own reports. *See e.g.* AR 00161 - 60, AR 00162, AR 00211 - 10, AR 00269 - 67,

30

AR 00436 - 35, AR 00442, AR 00443, AR 00457 - 55. In addition, Standard received the opinions of an orthopedic physician consultant. *See* AR 00273 - 71. Standard contacted Dr. Sobol by telephone and in writing so that its physician consultant could speak directly with him. *See* AR 00274, 00276 - 75. In response, Dr. Sobol prepared an additional report, which Standard took into consideration. *See* AR 00366 - 64. This report identified *only* "prolonged sitting" as preventing Plaintiff from returning to his duties. Standard's claim determination letter detailed its efforts and informed Plaintiff that his disability claim was denied. *See* AR 00466 - 61.

Following Standard's claim determination letter, it reviewed yet another report from Dr. Sobol, which provided no information to change Standard's view given its assessment of Plaintiff's "Own Occupation." *See* AR 00471. In addition, in connection with Plaintiff's appeal from the disability determination, Standard accepted and considered further information Plaintiff provided including, among other things: an additional letter from Dr. Sobol,[14] a "Comprehensive Rheumatologic Consultation and Report" prepared by a Dr. Salick, an Agreed Medical Examination conducted by a Dr. Sohn, and a "job analysis." *See* AR 00168, AR 00350 - 44, AR 00363 - 51, AR 00366 - 64, AR 00378, AR 00502 - 00. Once again, Standard referred Plaintiff's case to a physician consultant and a vocational case manager. *See* AR 00505. The physician consultant reviewed Plaintiff's records and concluded again that he would be able to perform the material duties of his sedentary job. *See* AR 00383 - 82. Similarly, the vocational case manager reviewed the new information, including the Job Analysis, and again concluded that Plaintiff's Own Occupation was sedentary and allowed for maximum self-regulated flexibility in position change. *See* AR 00173 - 72. Standard once again wrote to Plaintiff explaining its continued denial. *See* AR 00517 - 13.

Nevertheless, Standard conducted another (and totally separate) review through its Quality Assurance Unit. *See* AR 00518. Yet another physician consultant reviewed Plaintiff's medical records and reached the same conclusions that Standard's other

---

[14] Dr. Sobol opined that Plaintiff should adhere to "permanent work restrictions precluding him from heavy lifting, repetitive bending and stooping as well as from repetitive movements and prolonged postures of the head and neck." Heavy lifting and repetitive bending and stooping did not apply to Plaintiff's job. If Standard was correct in its conclusion that Plaintiff's Own Occupation allowed for maximum self-regulated flexibility in position change, Plaintiff could adequately avoid repetitive movements and prolonged sitting and/or postures.

physician consultants had reached. *See* AR 00390 - 88. The Quality Assurance Unit informed Plaintiff that its analysis was consistent with Standard's earlier analysis. *See* AR 00529 - 24.

## IV. Conclusion

As discussed above, there is no evidence that the structural conflict of interest which is present herein (and, indeed, "is a common feature of ERISA plans" generally, *Glenn*, 554 U.S. at 120 (Roberts, J., concurring)) affected the validity of the benefits decision made by Standard as to Plaintiff's claim. Standard's process was thorough, multi-staged, with procedures in place designed to ensure an objective consideration, did not disadvantage Plaintiff in any way in terms of the materials considered, and resulted in a reasoned conclusion. That is not to say, however, that the conflict of interest is thereafter ignored, or that it should not cause this Court's abuse of discretion review of Standard's decision to be "tempered by skepticism." *Abatie*, 458 F.3d at 959. It remains a factor to be weighed along with the other relevant considerations. *Glenn*, 554 U.S. at 117.

Also, as discussed above, this Court has now adjudicated this case applying the "structural conflicts framework as elucidated in *Montour*" as instructed by the Ninth Circuit in its Ruling. 2010 U.S. App. LEXIS 11103 at *2. In doing so, this Court has considered the three "nonexhaustive facts and circumstances" delineated in the Ruling and the additional contentions raised by the Plaintiff on remand.

After reviewing and considering the AR in detail, the pre- and post-trial briefs of the parties, the other materials in the file, and the oral arguments of counsel, and for the reasons stated above and in its previous January 15, 2009 decision, this Court again concludes that Standard did not abuse its discretion in denying Plaintiff LTD benefits under the Policy. Accordingly, judgment will be issued in favor of the Standard.

Defense counsel is order to prepare a proposed judgment and serve it on Plaintiff's counsel and the Court within three business days of the receipt of this decision.

Dated: This $10^{\underline{a}}$ Day of April, 2012.

GEORGE H. WU
United States District Judge